## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| TIM POWELL AND HEATHER POWELL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | NO. CIV-08-0753-HE |
| TODD NUNLEY, *et al.*, | ) ) | |
| Defendants. | ) ) | |

## ORDER

The claims in this case arise from the execution of an otherwise valid search warrant on the wrong house. Law enforcement officials obtained a search warrant for 110 W. Osage in Marlow, Oklahoma, correctly believing that to be the address of the person they were investigating. Through circumstances discussed more fully below, the warrant was executed by a search on the adjacent property — 106 W. Osage — occupied by plaintiffs Tim and Heather Powell.

Plaintiffs assert claims against Todd Nunley, an agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), seeking redress for alleged constitutional violations pursuant to <u>Biven v. Six Unknown Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971). They assert similar constitutional claims against Rodney Richards, then a Stephens County deputy sheriff, and against the Sheriff of Stephens County, pursuant to 28 U.S.C. §1983. The amended complaint references violations of the First, Fourth, and

Fourteenth Amendments to the Constitution.[1]  Plaintiffs also assert state law claims for trespass, intentional and negligent infliction of emotional distress, and assault and battery against all defendants.  The individual state defendants are sued in both their individual and official capacities.  All defendants have moved for summary judgment.

## Summary Judgment Standard

Summary judgment should be granted where — in light of the pleadings, discovery materials, and any affidavits — there is no "genuine issue" as to any "material fact" and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. Pro. 56(c)(2).  The court must review the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party.  In re Wal-Mart Stores, Inc., 395 F.3d 1177, 1189 (10th Cir. 2005).  The court may not make determinations of credibility nor weigh evidence, and must disregard all evidence favorable to the movant that the trier of fact would not be required to believe.  Gossett v. Oklahoma, 245 F.3d 1172, 1175 (10th Cir. 2001).  Mere conclusory allegations, without evidentiary support, do not create a genuine issue of fact.  L&M Enters., Inc. v. BEI Sensors & Sys. Co., 231 F.3d 1284, 1287 (10th Cir. 2000).

Summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Where the nonmoving party bears the burden of proof at trial, as the

---

[1]*The amended complaint makes passing reference to plaintiffs' First Amendment rights having been violated.  However, it contains no specific allegations which might support a First Amendment claim in these circumstances and none is otherwise apparent to the court.*

plaintiff does in this case, he cannot rely on his pleadings to defeat summary judgment; instead, he must put forth evidence sufficient to create a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Nevertheless, the moving party must demonstrate its entitlement to judgment as a matter of law.

## **Factual Background**

The facts in this case are, for the most part, undisputed. There is no dispute that, in May 2007, the Duncan, Oklahoma, police department was investigating the burglary of a residence. The items stolen included several firearms, including a machine gun, leading to the eventual involvement of Agent Nunley and the ATF in the investigation. The investigation led to a suspected participant in the burglary, Jody Mitchell, who eventually told officers that he participated in the burglary along with Gary Shannon. According to Mitchell, Shannon had the stolen weapons at his house located in Marlow. Mitchell did not know the street address but identified it on a map which he drew of the immediate area. He also described the location to the officers, based on its relationship to a nearby railroad track, a stop light, a curve in the road, an alley, and the presence of a trailer-type outbuilding or camper behind the Shannon residence.

After the interview with Mitchell, Duncan detective John Byers contacted two other police officers who were more familiar with the Marlow area to locate and identify the Shannon residence. According to Byers, one officer (Marlow P.D. Officer Smith) identified the road that Shannon lived on (Osage Road) and the second (Duncan P. D. Officer Williams) confirmed the street, indicated he thought Shannon lived there with his mother,

and described the location as (in Byer's words) "the second house from the curve. . . ."[2] During this same general time frame, defendant Richards, who also attended the initial interview with Mitchell, asked another deputy sheriff (Aguilera) to contact his wife, who worked for the Marlow Utilities Department, and verify where Shannon had utility service. Richards and Aguilera testified that Aguilera's wife confirmed that Shannon received utility service at 110 W. Osage.[3]  Plaintiffs do not dispute that the above information was shared with Agent Nunley.

Some time after the Mitchell interview, Agent Nunley and a Duncan P.D. captain (Evans) drove to Marlow to locate the Shannon house.  They identified what they thought was 110 W. Osage based on Mitchell's description of the house and the location on the map he drew.[4]  They noted the existence of a trailer located in back of, and situated somewhere

---

[2]*Plaintiffs' brief (plaintiff's response to Nunley motion) suggests a dispute as to some aspect of this, apparently based on other testimony of Byers.  It is unclear whether plaintiffs dispute that Byers testified as indicated, that Williams told Byers what Byers said he did, or whether they simply dispute the factual accuracy of the statement allegedly made.  In any event, nothing has been identified in the testimony of Detective Byers that appears to dispute the thrust of what the other officers allegedly told Byers.*

[3]*Plaintiffs dispute this assertion, relying on an affidavit of Mr. Shannon's mother that the utilities at 110 W. Osage were in her name, not Shannon's.  In light of the other testimony, not disputed by plaintiffs, that officers were aware Shannon was living with his mother, it is far from clear that the mother's affidavit really controverts anything.  In any event, the court concludes the indicated affidavit does not create a factual dispute as to whether the officers attempted to verify the address via utilities listings.*

[4]*As best the court can determine from plaintiffs' extraordinarily confusing description of the facts and testimony, plaintiffs object that the identified location did not actually match the description given by Mitchell.  It is unclear from plaintiffs' description why that is so, but, in any event, the submissions do nothing to put in issue the question of whether Nunley and Evans in fact made the trip and thought they had located the correct house.*

4

between, what they thought was 110 W. Osage and the residence to the west, but could not determine to which property the trailer belonged. They noted that the property they thought was 110 W. Osage (but which was in fact 106 W. Osage) had an unkept or rundown look to it,[5] while the adjacent property (actually 110 W. Osage) was well groomed. Both officers testified they did not observe street numbers on the property.[6] They took a picture of the property they thought was the target location.

Based on the above and other information, Nunley secured a no knock search warrant from a federal magistrate judge. The warrant identified the property to be searched as "the residence of [Shannon] located at 110 W. Osage Road, Marlow," attached a copy of the photo taken by the officers, and included directions as to how to get to the property.

At approximately midnight on the evening of June 27, 2007, the search warrant was executed by forced entry into the Powell home at 106 W. Osage. The tactical team from the Stephens County Sheriff's office was enlisted to make entry into and secure the residence, with the expectation that Nunley would conduct the actual search. Nunley waited outside while the house was entered. The tactical team broke open the front door and entered with weapons drawn, loudly shouting for Shannon in addition to giving other shouted instructions.

---

[5]*The officers indicated they thought the unkempt look was consistent with Shannon's status as a known drug user and felon.*

[6]*Plaintiffs dispute this fact based on the affidavit of Vesta Lavey, Shannon's mother, to the effect that her house had street numbers on the carport during this period of time. That, of course, is not the question. The question is whether the house the officers* <u>thought</u> *was the target (i.e. 106 W. Osage, not Ms. Lavey's house) had visible house numbers. The Lavey affidavit does not put this fact in issue.*

Mr. and Ms. Powell were in bed, unclothed and asleep, when the officers forced their way into the house. Mr. Powell started shifting in the bed, reaching for a shotgun he kept under it.[7] A sheriff's deputy forced him to the floor and held him there. There was no touching of Ms. Powell and neither Mr. or Ms. Powell suffered physical injuries, though they were held at gunpoint until the officers realized they were in the wrong house. Initially, they were not allowed to cover themselves,[8] but were a few minutes later once the mistake was realized. According to Mr. Powell, the time between the initial entry, the officers securing the area, and the appearance of Agent Nunley as the situation de-escalated was approximately five to ten minutes. Mr. Powell also indicated the officers did not search the house beyond where he told them the shotgun was.

The officers later conducted a search of the correct, adjacent property.

## **Constitutional Claims**

Plaintiffs assert claims for violation of their Fourth and Fourteenth Amendment

---

[7]*In their response to Nunley's motion, plaintiffs deny Mr. Powell reached for a shotgun but they cite no evidence to support the denial. Defendants' assertion that he did have and reach for a shotgun is based on the statements of Ms. Powell.*

[8]*The testimony indicates Ms. Powell was covered by a sheet to her waist and covered her upper body with her arms.*

rights.[9]  The claims against Deputy Richards and Stephens County are pursuant to 28 U.S.C.

§1983.  The claim against Agent Nunley is based on <u>Bivens v. Six Unknown Agents of</u>

<u>Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).  Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State . . . subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or other
> proper proceeding for redress. . . ."

Section 1983 does not create substantive rights, but merely provides a remedy for

deprivations of rights that are established elsewhere.  <u>Albright v. Oliver</u>, 510 U.S. 266, 271

(1994).  The judicially created <u>Bivens</u> action provides a basis for claims against federal

officers and employees similar to that authorized by §1983 as to state officers.

Here, plaintiffs essentially charge that their Fourth Amendment rights were violated

by the entry into their house without a warrant, the use of excessive or unreasonably

humiliating force in effecting the entry and detention, and the unreasonable prolonging of the

entry/search after the mistake was discovered.

The individual defendants all assert the defense of qualified immunity.  Where a

defendant asserts qualified immunity by summary judgment motion, the burden shifts to the

plaintiff to show that, on the facts alleged, the defendant violated his or her constitutional or

---

[9]*The Fourteenth Amendment's Due Process Clause makes the substantive protections of the Fourth Amendment applicable to the states.  <u>Mapp v. Ohio</u>, 367 U.S. 643 (1961).  Hereafter, references to plaintiffs' "Fourth Amendment" or "constitutional" claims embrace both amendments, as applicable to the particular defendant.*

statutory rights and that the right in question was clearly established at the time of the alleged violation. Fisher v. City of Las Cruces, 584 F.3d 888, 896 (10th Cir. 2009).

The Fourth Amendment provides that "[t]he right of the people to be secure in their person, houses . . . and effects, against unreasonable searches and seizures, shall not be violated. . . ." "At the very core" of the Fourth Amendment is the right of a person to be free from unreasonable governmental intrusion in his or her own home. Kyllo v. United States, 533 U.S. 27, 31 (2001). As a result, warrantless searches of a person's home are presumptively unreasonable, subject only to certain narrowly delineated exceptions. Here, it is undisputed that defendants did not have a warrant authorizing the search of plaintiffs' residence, 106 W. Osage, and that no exception to the warrant requirement (apart from whatever significance the mistakenly executed warrant had) is applicable.[10]

The Fourth Amendment is not necessarily violated, however, in circumstances such as exist here where officers have mistakenly executed a search warrant on the wrong property. As the Supreme Court stated in Graham v. Connor, 490 U.S. 386, 396 (1989): "The Fourth Amendment is not violated by . . . the mistaken execution of a valid search warrant on the wrong premises, Maryland v. Garrison, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987)." In Garrison, police officers obtained and executed a warrant to search "the premises known as 2036 Park Avenue third floor apartment." *Id.* at 80. The police

---

[10]*The parties do make passing reference to the fact that the picture attached to the warrant application and the warrant was of 106 W. Osage, the wrong house, rather than to the 110 W. Osage location otherwise referenced in both. However, so far as the court can discern from the briefs of the parties, no one has argued that this fact rendered the warrant invalid or has otherwise attached any particular significance to it.*

believed that there was only one apartment on the third floor, but there were in fact two, one occupied by the intended target of the search and the other by Garrison. In executing the warrant, the officers unknowingly entered Garrison's apartment and, before becoming aware they were in the wrong apartment, discovered contraband. In concluding the contraband should not be suppressed, the Court stated:

> While the purposes justifying a police search strictly limit the permissible extent of the search, the Court has also recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants.

*Id*. at 87. The Garrison court went on to define "honest mistakes" as "those of reasonable men, acting on facts leading sensibly to their conclusions of probability" and concluded that the question was ultimately whether the officers' actions in entering the second apartment were "objectively understandable and reasonable" under the circumstances. *Id* at 87-88. As a result, in determining whether the officers' entry into the Powell residence violated their Fourth Amendment rights, the question becomes whether the officers' actions, though mistaken, were nonetheless objectively reasonable so as to make the entry the sort of "honest mistake" to which Garrison alluded. *See also* Harman v. Pollock, 446 F.3d 1069 (10th Cir. 2006). And, in the context of a motion for summary judgment, the question becomes whether the proffered facts, viewed in the light most favorable to plaintiff, are sufficient to create a justiciable question as to the objective reasonableness of the officer's actions.[11]

---

[11]*The appellate cases are not always clear as to whether, as a strict theoretical matter, a reasonable mistake by officers results in the absence of a Fourth Amendment violation altogether or simply to the absence of officer liability, based on qualified immunity, for a violation that has*

The court concludes they are not. There is, of course, no evidence to suggest the officers knew the house they were entering was the wrong one or that they would have had any reason or incentive to take such a step had they known it was the wrong house.[12] Further, the undisputed facts show that the officers made a reasonable, albeit unsuccessful, effort to identify the house to be searched. They got from their informant an imprecise description of the premises where the stolen property allegedly was. The officers sought from the informant, and got, a map showing the location but the map did not identify the street and identified the target house with somewhat imprecise references to other landmarks (i.e. the "curve", the railroad tracks, the "stoplight" etc.). The undisputed facts establish that the officers then took various actions to attempt to identify the particular house. One of them inquired of other officers with more knowledge of the Marlow area and identified the street. The inquiries revealed that he lived with his mother. One of the officers sought to check utility listings to confirm the address. Nunley and another officer drove to the identified street in an effort to pinpoint the house. They noted the physical similarity of the residence to the description they had and an outbuilding similar to that identified by the informant, but could not determine which adjacent residence it was associated with. They noted the

_____

occurred. However, as the <u>Garrison</u> court discussed the issue in terms of a constitutional violation and in the context of a motion to suppress rather than in a §1983 context, the court has assumed the "objective reasonableness" inquiry goes to the substantive violation. In any event, it appears the result would be the same if viewed through the prism of a qualified immunity inquiry.

[12]One officer not present at the actual search indicated he was not totally certain of the correct location, but it is undisputed he did not share that information with Nunley or others on the search team.

rundown nature of what they thought was the correct house, compared to adjacent houses, a fact which they thought consistent with its occupancy by someone involved with illegal drugs. They did not see street numbers on the house they thought was the one.

Plaintiffs have, in part through their expert Michael Lyman, identified various things they say would have revealed the mistake. The officers might have searched surrounding houses for street numbers and learned the mistake from that. They might have transported the informant to the area to identify the house in person. They might have involved local police or used some sort of global positioning system to better identify the house. No doubt those are among the ways the mistake that occurred here might have been discovered and averted, but such 20-20 hindsight is not the test under <u>Garrison</u>. Rather, the question is whether "the officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched . . ." <u>Garrison</u>, 480 U.S. at 88-89. Here, the undisputed facts show that defendants at least made a "reasonable effort" to identify the proper location, though that identification ultimately proved to be mistaken.

Even if the officers' mistaken entry into the house is excused based on the above, there may still be an actionable violation of plaintiff's Fourth Amendment rights if unreasonable force was used or if the search continued after the error was realized.

In <u>Graham v. Connor</u>, 490 U.S. at 388, the Court considered "what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person," and held that such claims are "properly analyzed under the Fourth Amendment's 'objective

reasonableness' standard." "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Id.* at 396 (internal quotation omitted). The reasonableness of an officer's conduct must be measured not in hindsight, but "in light of the facts and circumstances confronting them" at the time of the incident in question. *Id.* at 397. "[T]he excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a *lawful* arrest or detention under the circumstances of the case." Cortez v. McCauley, 478 F.3d 1108, 1126 (10th Cir. 2007) (emphasis added). Thus, the question here is whether, under the circumstances which confronted the officers, the force used by them was objectively reasonable.

The undisputed facts show that the officers conducting the search made a nighttime entry into what they thought was the residence of a felon and drug user in possession of stolen property — stolen property which included a machine gun and other firearms. The forced entry was authorized by the terms of the warrant they were executing. The loud shouting and pointing of weapons were consistent with the need to secure the premises in a fashion that avoided unnecessary confrontations or other threats to the safety of the executing officers or others. Mr. Powell was forcibly taken to the floor by one officer, but the reasonableness of that action is clear. The officer perceived an action by Mr. Powell that might have involved reaching for a firearm — an action that was, in fact, exactly what Mr. Powell (understandably) had in mind. The officer's conduct was reasonably designed to

protect officer safety.  Similarly, the officers' requiring that the Powells not cover themselves further for a relatively brief period of time was consistent with minimizing potential threats to officer safety.  Upon initial entry, the officers had no way of knowing whether a firearm or other weapon might be under a pillow or the bedclothes or otherwise within reach of the Powells.  It was objectively reasonable for them to stop movement by the Powells until they were sure what the circumstances were.  To be sure, this sort of loud and aggressive entry into the house by armed men, the takedown of Mr. Powell, and preventing them from covering themselves was unquestionably terrifying and embarrassing to Mr. and Ms. Powell.  But the question for present purposes is not the impact on, or reaction of, the Powells.  Rather, the question is whether the officers' actions were objectively reasonable based on the circumstances the officers confronted.  The court concludes the proffered facts, even viewed in the light most favorable to plaintiffs, do not afford a basis for a finding that — viewed from the perspective of the officers — their use of force was objectively unreasonable.

Moreover, the undisputed facts show that the officers did not continue their search once they realized they were in the wrong house.  Garrison noted that  the officers there "were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units. . . ."  Garrison, 480 U.S. at 87.  In somewhat similar circumstances, the Tenth Circuit Court of Appeals stated:

> Thus, the search became unconstitutional only if it continued after the defendants realized, or reasonably should have realized, that the people named in the warrant as occupants of the apartment no longer resided there.

Peterson v. Jensen, 371 F.3d 1199, 1203 (10th Cir. 2004).  Here, plaintiffs' testimony was

to the effect that five to ten minutes had elapsed between the initial entry and the entry of Mr. Nunley into the room, which occurred immediately after the officers realized they had entered the wrong house. The entering officers were not reasonably required to instantly accept any protestations the Powells may have made that they were in the wrong place, but were entitled to take reasonable steps to independently confirm that fact.[13] A five to ten minute time period is not inconsistent with such a confirming investigation, particularly where it is undisputed that, apart from securing the premises, the officers did not otherwise search the house.[14] The undisputed facts are that no search occurred beyond the area where Mr. Powell told them the shotgun was. In these circumstances, the undisputed facts establish that the officers' actions as to duration and scope of the search were not objectively unreasonable.

In the circumstances existing here, defendants have shown entitlement to summary judgment as to plaintiffs' constitutional claims. While it is clear that plaintiffs suffered a terrifying experience as a result of the defendants' conduct, that conduct does not amount to an actionable constitutional violation under the standards set out in Garrison and its

---

[13]*See* Peterson v. Freeman*, 371 F.3d at 1202, noting that plaintiff's pleadings could be read to allege either that defendants continued their search* until *independently confirming the facts as to the occupants or that they continued it* after *verifying those facts. The court noted it was the latter reading that stated a constitutional violation.*

[14]*Compare* Harman v. Pollock*, supra, where the allegations were that plaintiffs were detained for approximately 90 minutes, the first 60 of those in handcuffs, and that officers continued the search after they knew the target occupants of the searched premises no longer lived there.*

progeny.[15]  Summary judgment will be entered for defendants as to plaintiffs' constitutional claims.

## State Law Claims

Plaintiffs assert state law claims for trespass, intentional and negligent infliction of emotional distress,[16] and assault and battery.  After giving effect to the court's prior order dismissing certain claims, these state law claims are asserted against the United States, Richards, and the Sheriff of Stephens County.  Each of the affected defendants has moved for summary judgment on the claims pertaining to that defendant.[17]

The grounds for defendants' motions involve arguments based both on the status of, or relationships between, the particular defendants and on whether a sufficient basis for the particular substantive violation has been made out against any defendant.  The "status" arguments are addressed first.

The United States argues Agent Nunley's personal actions did not constitute tortious conduct and that there is no basis for holding it liable for any action taken by the county tactical team, as the team members were not "employees" of the United States and hence within the scope of the FTCA's waiver of sovereign immunity.  The FTCA provides a

---

[15]*As the court concludes no constitutional violation occurred here, it is unnecessary to address whether there is a basis for imposing liability on Stephens County.*

[16]*Plaintiffs' response concedes there is no evidence of physical injury as to either of them, a necessary requirement under Oklahoma law for a <u>negligent</u> infliction claim.*

[17]*The parties' briefing as to many of the state law claims and the impact of the tort claims acts has been somewhat cursory.*

limited waiver of sovereign immunity as to certain torts committed by government "employees" acting within the scope of their employment. Curry v. United States, 97 F.3d 412, 414 (10th Cir. 1996). "Employee of the government" is defined to include "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation ...." 28 U.S.C. §2671. In determining the reach of this definition, the "critical question" is whether the federal government had the power to control the detailed physical performance of the individual involved. Tsosie v. U.S., 452 F.3d 1161, 1163 (10th Cir. 2006) (quoting Duplan v. Harper, 188 F.3d 1195, 1200 (10th Cir. 1999). Although the "control" test appears to have been most often employed in determining whether a person is an "employee" versus an "independent contractor", the cases appear to apply the same approach in determining the application of §2671's "acting on behalf of" language. See Means v. U.S., 176 F.3d 1376, 1379-1380 (11th Cir. 1999).

In the present circumstances, the court concludes a justiciable question remains as to whether the United States had the requisite level of control over the tactical team to render its members federal "employee[s] of the government." Unlike the situation in Means, where the court found it undisputed that the state officers made all the tactical decisions as to entry into the house and the appropriate force to use, the evidence here is considerably less clearcut. While Agent Nunley expressed ambivalence as to who was in charge of the operation, there is evidence from which the jury might conclude a significant level of control on his part. It is clear that Agent Nunley took the lead in securing the search warrant. The

search warrant obtained was a federal warrant arising out of, at least in part, a federal criminal investigation. There is testimony that Nunley was present at and participated in the pre-search briefing. He testified the plan was for him to conduct the actual search after entry and securing the premises had been achieved. There is testimony from other participants suggesting a level of deference to Nunley as to various aspects of the operation. In these circumstances, a question of material fact remains as to whether Nunley and the federal government possessed the necessary degree of control over the actions of other participants, hence a summary determination precluding liability as to the United States is unwarranted.

Insofar as the claims against the state defendants (the sheriff/county and Richards) are concerned, they are subject to Oklahoma's Governmental Tort Claims Act, 51 Okla. Stat. §§ 151 et seq. ("GTCA"). Subject to certain exceptions, the GTCA provides that "[t]he state, its political subdivisions, and all their employees acting within the scope of their employment . . . shall be immune from liability for torts." 51 Okla. Stat. § 152.1(A).

The court concludes the state claims against defendant Richards must be rejected based on the GTCA. As noted above, employees of a political subdivision acting within the scope of their employment are immune from liability for torts. Plaintiffs have not produced evidence or suggested a plausible basis for concluding that Richards's actions were outside the scope of his employment. If there is some other basis for imposing liability on Richards as to the state law claims, the plaintiffs' arguments are simply too scattered and unfocused for the court to discern it. Summary judgment will be entered for defendant Richards on the state claims.

17

Insofar as the claims against Stephens County are concerned, the county argues that plaintiffs' claims fail because they have "sued the wrong party." It is altogether unclear to the court whether defendant is arguing the County has not been served properly, or that the prerequisites for liability under the Oklahoma Governmental Tort Claims Act have not been met, or something else. The parties have acknowledged that, as to plaintiffs' §1983 claims, a claim against the sheriff in his/her official capacity is the same as a suit against Cleveland County and that has perhaps diverted attention from whatever point it is that the County is now making. In any event, the court concludes the substance is that Stephens County is a defendant in this suit and, to the extent some technical defect exists as to service or otherwise, it does not afford a basis for summary judgment as to the state claims.

Stephens County also argues that the officers' conduct here falls under certain GTCA exceptions retaining sovereign immunity for claims resulting from "[j]udicial, quasi-judicial, or prosecutorial functions" or from the "[e]xecution or enforcement of the lawful orders of any court." 51 Okla. Stat. § 155(2) & (3). However, those exceptions are inapplicable where an officer "exceeds his authority in executing a search warrant." Sullivant v. City of Oklahoma City, 940 P.2d 220, 223 (Okla. 1997). In Sullivant, an apartment owner sued two Oklahoma cities under the GTCA for damages resulting from their police officers' forced entry into the apartment. Id. The defendants argued that the officers' conduct, which occurred in the course of executing a search warrant, was immune under § 155 as an "[e]xecution or enforcement of the lawful orders of any court." Id. The Oklahoma Supreme Court concluded, however, that evidence of non-compliance with an Oklahoma statute

regarding search warrants created a factual dispute as to whether the officers had exceeded their lawful authority in executing the warrant. As a result, summary judgment in the cities' favor was reversed. As pertinent here, <u>Sullivant</u> establishes that a political subdivision may not avoid liability, based on the indicated exceptions, if its officer's actions exceed the scope of their lawful authority. Here, the officers entered the residence at 106 W. Osage, where their lawful authority pursuant to the warrant extended only to 110 W. Osage. As a result, the indicated exceptions do not supply a basis for summary judgment in defendants' favor.

The remaining arguments offered by defendants relate to the substantive elements of the particular torts alleged or to substantive defenses applicable to them.

Defendants have argued, on various theories, that no basis exists in these facts for the tort of intentional infliction of emotional distress.[18] In order to make out this tort under Oklahoma law, a plaintiff must prove that, among other things, "the defendant acted intentionally or recklessly." <u>Computer Publ'ns Inc. v. Welton</u>, 49 P.3d 732, 735 (Okla. 2002). For substantially the same reasons as discussed above with respect to the constitutional claims, the court concludes the undisputed facts show the absence of this necessary element of plaintiffs' claims. While the various defendants' actions resulted in the execution of the warrant on the wrong premises, there is no evidence suggesting any intentional wrongdoing on the officers' part. Further, the undisputed facts establish the officers made a reasonable effort to identify the proper location, which the court concludes

---

[18]As noted above, plaintiffs have conceded no basis exists here for a claim based on <u>negligent</u> <u>infliction of distress</u>.

is inconsistent with a determination of "reckless" conduct. Summary judgment will therefore be granted in defendants' favor as to the claim for intentional infliction of emotional distress.

Plaintiffs also assert a claim for trespass. Under Oklahoma law:

> a trespasser is one who enters upon property of another without any right, lawful authority, or express or implied invitation, permission, or license, not in performance of any duty to owner or person in charge or any business of such person but merely for his own purposes, pleasure, or convenience, or out of curiosity.

Williamson v. Fowler Toyota, Inc., 956 P.2d 858, 862 (Okla. 1998). Defendants contend they are not liable for trespass because the officers entered the plaintiffs' home under authority of a lawfully issued search warrant. They rely on Lawmaster v. Ward, 125 F.3d 1341, 1352 (10th Cir. 1997), which concluded the defendant ATF agents were not liable for trespass because their entry into the plaintiff's residence was authorized by a valid warrant. However, as with the discussion of Sullivant and the GTCA exemption discussed above, defendants fail to come to grips with the essential facts of this case. Unlike in Lawmaster, where the officers entered the location identified in the warrant, the officers here entered the wrong house — 106 W. Osage rather than 110 W. Osage. As a result, Lawmaster does not afford a basis for summary judgment in defendants' favor.

Plaintiffs also assert assault and battery claims. The county argues the claims are barred by Oklahoma's one-year statute of limitations applicable to such claims, 12 Okla. Stat. §95(A)(4), arguing that this case was filed more than one year after the June 26, 2007,

incident.[19]  The court concludes to the contrary.  Under Oklahoma law, "a cause of action does not accrue until the claim can be maintained."  Brown v. Creek County ex rel. Creek County Board of County Comm'rs., 164 P.3d 1073, 1075 (Okla. 2007).  In light of the procedures applicable to claims against political subdivisions under the GTCA, the right to sue does not attach until the claim is denied, or deemed denied, by the subdivision.  The statute of limitations applicable to suits based on such claims is that established by the GTCA — 180 days after the denial of the administrative claim — rather than that established by the general limitations statute, 12 Okla. Stat. §95.  Brown, 164 P.3d at 1076.  The parties' submissions do not address the specifics of when or how plaintiffs' claims were denied.  It is at least clear, however, that 12 Okla. Stat. §95 does not bar plaintiffs' assault and battery claims.

Insofar as the elements of an assault and battery claim are concerned, Oklahoma follows the approach of the Restatement (Second) of Torts.  Brown v. Ford, 905 P.2d 223, 229 (Okla. 1995).  The Restatement provides:

> § 13:  An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the other directly or indirectly results.

> § 21:  An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contract, and (b) the other is thereby put in such an imminent apprehension.

---

[19]*This case was filed July 21, 2008.  Docket entry #1.*

There is, of course, evidence of contact with Mr. Powell which might be deemed offensive and evidence which would support an inference of apprehension of imminent contact by both plaintiffs. Stephens County argues that the force used was both reasonable and "incidental to the officers' execution of a valid warrant" and thus should not support liability. However, the county has not provided any authority to support such a defense beyond the same "lawful authority" justification referenced in <u>Sullivant</u> and <u>Lawmaster</u> and, as discussed above, the rationale of those cases does not extend to the circumstances arguably existing here. The court concludes summary judgment is not warranted as to plaintiffs' assault and battery claim against the United States and Stephens County.

### Summary

Based on the foregoing, the summary judgment motions of defendants Richards [Doc. #74] and Nunley [Doc. #72] are **GRANTED** as to the claims against them. The motion of Stephens County [Doc. #71] is **GRANTED** as to plaintiffs' constitutional (§1983) claims and their claims for negligent and intentional infliction of emotional distress, but **DENIED** as to the claims for trespass and assault and battery. The motion of the United States [Doc. #73] is **GRANTED** as to plaintiffs' constitutional claims and their claims for negligent and intentional infliction of emotional distress, but **DENIED** as to the claims for trespass and assault and battery.

The claims against the United States and Stephens County for trespass and for assault and battery remain for trial.

**IT IS SO ORDERED**.

Dated this 14th day of January, 2010.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE